13 CV 1403

POLLY ATKINSON
atkinsonp@sec.gov
KIMBERLY L. FREDERICK
frederickk@sec.gov
SECURITIES AND EXCHANGE COMMISSION
1801 California Street, Suite 1500
Denver, Colorado 80202
(303) 844-1000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>- against -<br><br>RANDAL KENT HANSEN, RAHFCO MANAGEMENT GROUP, LLC, VINCENT PUMA, and HUDSON CAPITAL PARTNERS CORPORATION,<br><br>Defendants. | 13 Civ. _____<br><br>**COMPLAINT**<br>**and**<br>**JURY DEMAND**<br><br>**ECF CASE** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

defendants Randal Kent Hansen ("Hansen"), RAHFCO Management Group, LLC ("RAHFCO

Management"), Vincent Puma ("Puma"), and Hudson Capital Partners Corporation ("HCP"),

alleges as follows:

## SUMMARY

1.      This case involves the fraudulent offer and sale of securities in two private hedge

funds – RAHFCO Funds LP ("Funds LP") and RAHFCO Growth Fund LP ("Growth LP")

(collectively the "RAHFCO Hedge Funds") by the defendants and others in a scheme that

defrauded investors out of more than $10 million.

2.      From at least April 2007 through May 2011, defendant Hansen, the principal and
president of defendant RAHFCO Management, and defendant Puma, the principal of defendant
HCP, engaged in a scheme to defraud investors by convincing them to invest in private hedge
funds that purportedly traded in options and futures on the S&P 500 Index and in equities.  In
fact, the defendants did not follow the stated trading strategy, they misrepresented their trading
success, they misused investor funds to make Ponzi payments to other investors, and they used
investor funds for the defendants' own purposes.  In furtherance of the scheme, defendants
manipulated a reputable accounting firm into ostensibly verifying false account statements and
other false documents that were provided to investors, made Ponzi payments to evade detection,
and made numerous false and misleading statements.  The defendants' scheme was successful,
convincing approximately 100 individuals nationwide to invest over $23 million in the RAHFCO
Hedge Funds.

3.      Defendant Puma, the principal of defendant HCP (the sub-adviser/portfolio
manager to the RAHFCO Hedge Funds), repeatedly provided false, inflated information
regarding the value of the funds and the funds' trading performance information to Hansen or
RAHFCO Management and to an accounting firm hired by the RAHFCO Hedge Funds,
including false Forms 1099.  In turn, these false trading returns and valuations were reported on a
monthly and quarterly basis to investors.

4.      Defendant Hansen was the public face of the fraudulent scheme.  Throughout the
relevant period, Hansen made presentations to and answered questions from investors and
prospective investors.  Hansen misled investors by telling them that the RAHFCO Hedge Funds
made sufficient earnings through the trading strategy to pay investor withdrawals from the funds;
when in truth, Hansen resorted to paying investors from funds provided by other investors in

Ponzi-like fashion. In addition, Hansen continued to solicit investors in the RAHFCO Hedge

Funds even after receiving numerous red flags casting doubt on the reported performance, safety,

legitimacy, and liquidity of the RAHFCO Hedge Funds.

5.      The RAHFCO Hedge Funds raised approximately $23.5 million in investor

deposits between 2007 and the time of the funds' collapse in May 2011. When the RAHFCO

Hedge Funds collapsed, investors lost more than $10 million. As a result of the fraudulent

enterprise, Hansen and RAHFCO Management received approximately $1.95 million in claimed

investment profits and management fees and Puma and HCP received approximately $1.65

million of investor money.

## VIOLATIONS

6.      By virtue of the conduct alleged herein, defendants Hansen and RAHFCO

Management directly or indirectly engaged in transactions, acts, practices or courses of business

that constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15

U.S.C. § 77q(a)], Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 ("Exchange

Act") [15 U.S.C. §§ 78j(b) and 78o(a)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], Sections

206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C.

§§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

Unless defendants Hansen and RAHFCO Management are permanently restrained and enjoined,

they will again engage in the transactions, acts, practices, and courses of business set forth in this

Complaint, and in transactions, acts, practices, and courses of business of similar type and object.

7.      Also by virtue of the conduct alleged herein, defendants Puma and HCP directly

or indirectly engaged in transactions, acts, practices or courses of business that constitute

violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. In

addition, defendants Puma and HCP aided and abetted Hansen's and RAHFCO Management's

violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1),

80b-6(2), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]. Unless

defendants Puma and HCP are permanently restrained and enjoined, they will again engage in

the transactions, acts, practices, and courses of business set forth in this Complaint, and in

transactions, acts, practices, and courses of business of similar type and object.

8.    In the alternative, by virtue of the conduct alleged herein, defendant HCP aided

~~and abetted defendant Puma's violations of Section 17(a) of the Securities Act~~ [15 U.S.C. §

77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17

C.F.R. § 240.10b-5], and Hansen's and RAHFCO Management's violations of Sections 206(1),

206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule

206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8], and, unless permanently restrained and

enjoined, will again engage in the transactions, acts, practices, and courses of business set forth

in this Complaint, and in transactions, acts, practices, and courses of business of similar type and

object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9.    The Commission brings this action pursuant to the authority conferred upon it by

Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15

U.S.C. § 78u(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].

10.    The Commission seeks permanent injunctions against defendants Hansen

RAHFCO Management, Puma, and HCP, enjoining them from engaging in the transactions, acts,

practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains

4

from the unlawful activity set forth in this Complaint, together with prejudgment interest, and civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]. In addition, the Commission seeks any other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and Sections 209 and 214 of the Advisers Act [15 U.S.C. §§ 80b-9 and 80b-14].

12.     Venue lies in this Court pursuant to Sections 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], Section 214(a) of the Advisers Act [15 U.S.C. § 80b-14(a)], and 28 U.S.C. § 1391(b). Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York. Defendant HCP is a New York corporation with its principal place of business in New York, New York.

## DEFENDANTS

13.     **Randal Kent Hansen**, 64, of Sioux Falls, South Dakota owns RAHFCO Management, the general partner of the RAHFCO Hedge Funds. Hansen is the only identified principal of RAHFCO Management. Hansen has never been registered as, or associated with, a broker-dealer. Additionally, Hansen has never been registered as an investment adviser with the Commission or any state.

14. **RAHFCO Management Group, LLC,** a Delaware limited liability company, with its principal place of business in Sioux Falls, South Dakota, served as the general partner of the RAHFCO Hedge Funds. It managed the funds and had discretionary authority to invest the funds' assets. Defendant Hansen owns 100 percent of the entity. The North Dakota Securities Department ("NDSD") has issued cease and desist and stop orders against RAHFCO Management suspending the offer and sale and registration exemptions of the RAHFCO Hedge Funds. RAHFCO Management has never been registered as a broker-dealer with the Commission or as an investment adviser with the Commission or any state.

15. **Vincent Puma**, 41, of Morganville, New Jersey owns 100 percent of HCP. Puma acted as an investment adviser to the RAHFCO Hedge Funds. Puma is not registered as an investment adviser. The Financial Industry Regulatory Authority ("FINRA") permanently barred Puma from association with any FINRA member in any capacity in October 2011 [Docket/Case No. 2010024522101].

16. **Hudson Capital Partners Corporation** is a New York corporation with its principal place of business in New York, New York. Puma is the sole principal of HCP. Although the offering memoranda of the RAHFCO Hedge Funds identify other Puma-owned entities as the funds' investment advisers, HCP in fact served as the investment adviser to both funds. HCP is not registered as an investment adviser.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

17. **Anthony Johnson** ("Johnson"), 42, of Katonah, New York owns Gibraltar Partners, Inc. ("Gibraltar"). From at least April 2007 through April 2011, Johnson participated in managing the RAHFCO Hedge Funds and soliciting investors for the funds. In April 2011, a criminal information was filed against Johnson in the Eastern District of New York alleging

6

fraud related to the facts alleged in this complaint. The information alleged that Johnson solicited investor money for Gibraltar and the RAHFCO Hedge Funds, while knowing that the investment scheme was fraudulent. *See United States v. Anthony John Johnson*, 11 CR 854 (E.D.N.Y.). In resolution of this case, on June 14, 2012, Johnson pled guilty to one count of mail fraud. Separately, in 2007, Johnson was indicted in the Eastern District of New York for securities fraud for conduct unrelated to the RAHFCO Hedge Funds, and on November 19, 2008, he pled guilty to one count of conspiracy to commit securities fraud, mail fraud, and wire fraud. The National Association of Securities Dealers ("NASD") had barred him in 2006 based on the same conduct. *See United States v. Anthony John Johnson*, 07 CR 854-3 (E.D.N.Y.). As a result of the two separate criminal prosecutions, Johnson was sentenced to serve 120 months in prison in the 2011 case to run consecutively with an 18-month sentence imposed in the 2007 case and ordered to pay restitution of $12.76 million.

18.     **Ward Onsa** ("Onsa"), 60, of Marco Island, Florida is identified in the private placement memoranda of RAHFCO Hedge Funds as a "trader" for both funds. He is not registered in the financial industry in any capacity. On November 18, 2010, Onsa was indicted in the Eastern District of New York for securities and wire fraud unrelated to the RAHFCO Hedge Funds. *See United States v. Ward Onsa*, 10 CR 730 (E.D.N.Y.). On December 15, 2011, Onsa pled guilty to one count of securities fraud. On July 26, 2012, Onsa was sentenced to 78 months in prison and ordered to pay $3.1 million in restitution.

## FACTS

19.     In 2001 or 2002, defendant Hansen became a customer of Johnson, who was working as a securities broker at that time. Among other things, Hansen invested through a

company run by Onsa and Puma. Puma and Onsa purportedly used puts and calls[1] to hedge investments in the S&P 500.[2]

20.    In 2003, Hansen, Johnson, Puma, and Onsa met in Philadelphia, Pennsylvania. During the meeting, Hansen indicated that he knew a lot of wealthy potential investors and proposed that he be made a partner with Puma, Onsa, and Johnson. Onsa and Puma, proposed that Hansen establish a "feeder fund" which would direct investors to Onsa and Puma. Hansen did so. Between 2003 and 2007 the feeder fund had several names, including Capstone Investment Funds, LLP ("Capstone").

21.    According to the Capstone Private Placement Memorandum ("PPM"), the purpose of Capstone was to "pool investment funds of its investors" with those of Capstone "for the purpose of investing and trading in a wide variety of securities and financial instruments."

### Creation of the RAHFCO Hedge Funds and Subsequent Collapse

22.    Hansen created Funds LP in April 2007, when he closed Capstone and solicited Capstone investors to roll their investments into his newly created fund. Investors were told that Funds LP would have the save investment strategy as Capstone, purportedly using puts and calls to hedge investments in the S&P 500. In addition, Hansen informed at least one investor that the roll-over would be audited.

---

[1] A call option is a financial contract between two parties that gives the buyer the right, but not the obligation, to buy an agreed quantity of stock during a specified time period for a specified price, known as the strike price. A buyer pays a fee, or premium, to purchase this right. A buyer of a call option generally stands to gain if the price of the stock increases. Conversely, a put option is a financial contract between two parties that gives the seller the right, but not the obligation, to sell an agreed quantity of stock during a specified time period at a specified strike price. The seller pays a fee to purchase this right. A buyer of a put option generally stands to gain if the price of the stock decreases.

[2] The S&P 500 is a stock market index based on the common stock prices of 500 top publicly traded American companies, as determined by Standard & Poor's, a division of McGraw-Hill Companies, Inc. that publishes a variety of stock market indices.

23.     In connection with creating Funds LP, Hansen was responsible for preparing the Funds LP PPM, which was mailed, e-mailed, and delivered to Capstone investors and other potential investors.

24.     Hansen also opened a bank account in the name of Funds LP at Wells Fargo. The bank account opening documents show Hansen as the owner of Funds LP. Hansen had sole signatory authority on the account and received the monthly statements for the account.

25.     Approximately $130,000 was deposited into Funds LP's bank account from Capstone. Nevertheless, Puma and Hansen created and distributed account statements to investors that falsely represented that approximately $13 million was transferred from Capstone to Funds LP in April 2007.

26.     Hansen created Growth LP in March 2008, claiming that Funds LP was fully subscribed. Similar to Funds LP, Growth LP also allowed investors to purchase limited partnership interests.

27.     In connection with creating Growth LP, Hansen was responsible for preparing the Growth LP PPM, which was mailed, e-mailed, and delivered to prospective investors.

28.     Hansen also opened a bank account at Wells Fargo as Randal K. Hansen DBA RAHFCO Growth. Hansen and his daughter had signatory authority on this account and Hansen received the monthly statements for the account.

29.     In December 2010, Growth LP closed, ostensibly because it did not attract enough investors to justify the cost of continuing the fund. When Growth LP closed, RAHFCO Management gave investors the option to either liquidate their investment or transfer their investment into Funds LP.

30.     Funds LP continued to operate for almost another year and a half before it collapsed in May 2011.  In May 2011, Hansen sent a letter to the remaining Funds LP investors advising that it had come to his attention that "earnings figures in our [Funds LP] statements have been inaccurate."

**Defendants Engaged in a Scheme to Defraud by Conducting a Ponzi Scheme**

31.     In order to entice investment in their fraudulent scheme, defendants promised that investors could easily redeem their investments.  In fact, however, the RAHFCO Hedge Funds lacked liquidity and redemptions and other payments to existing investors almost always came from newly invested funds.

32.     After Hansen, or others participating with Hansen in the scheme, sold investments in the RAHFCO Hedge Funds, the invested funds were deposited in the Funds LP or Growth LP bank account.  They sometimes co-mingled investor funds in the bank accounts without regard to which fund the investor had actually invested in.  Periodically, Hansen sent the invested funds from the Funds LP and Growth LP bank accounts to Puma or HCP, ostensibly so that the funds could be traded using the designated trading strategy that had been represented to investors.

33.     According to the terms of the initial investments in the RAHFCO Hedge Funds, investors could redeem some or all of their investments upon thirty days' notice.  Throughout the relevant time period, numerous investors did seek to redeem all or part of their investments.  When Hansen or RAHFCO Management was notified of a redemption request, Hansen would directly or indirectly contact Puma, who was to provide the funds for the redemption.

34.     From 2007 through 2010, however, the RAHFCO Hedge Funds earned only about $280,000 in actual trading profits, while paying redemptions to investors which included $6.1

million as purported trading profits.  At least $5.66 million of the redemptions paid to investors in excess of the actual trading profits came from new investor funds.

35.     During the early part of the scheme the defendants raised enough new investor funds to pay all requested redemptions in a timely fashion.  During the latter part of the scheme, however, new investor funds were insufficient to keep pace with the requests for redemptions by earlier investors.  When that occurred the defendants created numerous explanations and excuses to lull investors.  Eventually the defendants were unable to meet the redemption requests and the scheme collapsed.

## Defendants Engaged in a Scheme to Defraud Through the Practice of Disseminating False Account Statements

36.     As part of the fraudulent scheme, defendants disseminated false account statements and tax documents to investors in order to retain existing RAHFCO Hedge Fund investors and to attract new investments.  The misleading account statements and tax documents falsely indicated that the RAHFCO Hedge Funds' trading strategy was successful, purportedly generating double-digit positive returns.

37.     Each month Puma and HCP provided false earnings calculations for the RAHFCO Hedge Funds to an accounting firm hired by the RAHFCO Hedge Funds, sometimes using Hansen or RAHFCO Management as an intermediary.  The accounting firm reviewed account statements for each investor based on the fictitious information provided by Puma and Hansen.  The account statements were then disseminated to investors.

38.     From 2007 through May 2011, Puma and HCP falsely reported to investors that the RAHFCO Hedge Funds earned over $9 million, approximately a 25% return - in fact, the funds earned only $280,000, or a return of less than 2%.

39.     The aggregate fictitious earnings for the RAHFCO Hedge Funds were also published by Hansen and RAHFCO Management on RAHFCO's website and provided to prospective investors.

40.     In addition, each year from 2007 through 2010, Puma and HCP provided RAHFCO Management with false tax Forms 1099, indicating the purported trading profits of the RAHFCO Hedge Funds. The accounting firm hired by the RAHFCO Hedge Funds used the false information from the Forms 1099 to prepare Schedules K-1 for the RAHFCO Hedge Funds. Hansen and RAHFCO Management then sent the resulting false Schedules K-1 to investors.

41.     The false account statements and tax documents were material to investors since investors generally consider potential and actual returns and profits when making investment decisions.

### Defendants Supported the Scheme to Defraud Through the Practice of Making False Statements Regarding the RAHFCO Hedge Funds

42.     From April 2007 through April 2011, defendant Hansen solicited investors and brokers into the RAHFCO Hedge Funds. Hansen and RAHFCO Management emailed prospective investors and brokers, met with them one-on-one and in group settings, and traveled around the country to develop and maintain relationships.

43.     Although he engaged brokers and other sales agents to sell the partnership interests, Hansen answered most substantive investor questions and was the only principal with access to the bank accounts of the RAHFCO Hedge Funds.

44.     When soliciting investors, Hansen generally described to investors the funds' trading strategy of using puts and calls to hedge investments in securities and commodities. He explained that the trader for the funds (Onsa) had developed and successfully used this strategy

for over 20 years and that Puma and HCP, the investment adviser to the funds, endorsed the strategy.

45.     Hansen and RAHFCO Management were able to attract new investments and retain existing investors by falsely representing to investors that the RAHFCO Hedge Funds' trading strategy was successful and generated double-digit positive returns.  From 2007 through May 2011, Hansen represented to investors that RAHFCO Hedge Funds earned over $9 million, approximately a 25% return.  During the relevant period, Hansen and RAHFCO Management made these representations orally, in account statements mailed or e-mailed to investors, and on RAHFCO's website.  Many investors made additional investments after their initial investment, each time investing based on Hansen's reaffirmation of his enthusiastic support of the funds' successful trading strategy.

46.     In fact, the RAHFCO Hedge Funds' trading strategy was not successful and did not generate double digit returns.  The RAHFCO Hedge Funds received only about $280,000 in trading profits on the approximately $23.5 million invested, a return of less than 2%.

47.     Misrepresentations about the success of the RAHFCO Hedge Funds' trading strategy and the returns generated by that trading strategy were material to investors since investors generally consider potential returns when making investment decisions.

48.     Hansen and RAHFCO Management were also able to attract new investments in the RAHFCO Hedge Funds and retain existing RAHFCO Hedge Fund investors by falsely describing the funds' trading strategy as safe, conservative, and low risk.  During the relevant period, Hansen and RAHFCO Management made these misrepresentations orally, in e-mails, and on RAHFCO's website.

49.     The RAHFCO Hedge Funds were not safe, conservative, or low risk.  Investors lost approximately $10.5 million from investing in the RAHFCO Hedge Funds.  This loss fell disproportionally on investors who invested later in the scheme.  Earlier investors, including members of Hansen's family, redeemed their investments and were repaid using funds invested by later investors.  Many later investors lost their entire investment.

50.     Misrepresentations that the RAHFCO Hedge Funds' trading was safe, conservative, and low risk were material to investors since investors generally consider risk and safety when making investment decisions.

51.     Hansen and RAHFCO Management also attracted new investments in the RAHFCO Hedge Funds and retained existing RAHFCO Hedge Fund investors by falsely representing that only a small portion of the investment was at risk and that the remaining funds were invested in cash or cash equivalents in RAHFCO Hedge Funds accounts.  During the relevant period, Hansen and RAHFCO Management made these misrepresentations orally, in e-mails, on RAHFCO's website, and in the RAHFCO Hedge Funds' PPMs.

52.     In fact, only a small portion of the funds invested in the RAHFCO Hedge Funds were invested in cash or cash equivalents in accounts belonging to or in the name of the RAHFCO Hedge Funds.

53.     Misrepresentations that only a small portion of the investment was at risk and that the remaining funds were invested in cash or cash equivalents in RAHFCO Hedge Funds accounts were material to investors since investors generally consider risk and safety when making investment decisions.

54.     Hansen and RAHFCO Management also attracted new investments in the RAHFCO Hedge Funds and retained existing RAHFCO Hedge Fund investors by

14

misrepresenting that the funds were liquid – entirely in cash or cash equivalents – every thirty days, and that investors could redeem their investments upon thirty days' notice. During the relevant period, Hansen and RAHFCO Management made these misrepresentations orally, in e-mails, on RAHFCO's website, and in the RAHFCO Hedge Funds' PPMs.

55.     In reality, the funds were not entirely in cash or cash equivalents every thirty days and investors were not always able to redeem their investments upon thirty days' notice. Some investors waited longer than thirty days for their redemptions, and some investors were never able to redeem their investments.

56.     Misrepresentations that the RAHFCO Hedge Funds were liquid were material to investors since investors generally consider liquidity when making investment decisions.

57.     Hansen and RAHFCO Management were also able to attract new investments in the RAHFCO Hedge Funds and retain existing RAHFCO Hedge Fund investors by misrepresenting that the RAHFCO Hedge Funds had been or were being audited by accountants. During the relevant period, Hansen made these misrepresentations orally, in e-mails to investors, and on RAHFCO's website. The misrepresentation also appeared in the RAHFCO Hedge Funds' PPMs.

58.     In fact, the auditor for the RAHFCO Hedge Funds resigned when it was unable to confirm the existence of the invested funds. The auditor was never replaced and no audit was ever conducted.

59.     Misrepresentations that the RAHFCO Hedge Funds' were audited or were being audited were material to investors since whether a hedge fund is audited by accountants bears on the safety and security of the investment and investors generally consider these factors when making investment decisions.

**Representations and Misrepresentations in the**
**RAHFCO Hedge Funds' Private Placement Memoranda**

60.     Both the Funds LP PPM and the Growth LP PPM represented that the funds were "formed to pool investment funds of its investors" with those of RAHFCO Management "for the purpose of investing and trading in a wide variety of securities and financial instruments."

61.     According to the RAHFCO Hedge Funds' PPMs, RAHFCO Management was the general partner of both funds.  As the general partner, RAHFCO Management was responsible for "management of the Partnership's affairs," had "discretionary authority to invest" investor funds, and was "responsible for all investment decisions."  The PPMs further asserted that investors "do not have any right to participate in the management" of the RAHFCO Hedge Funds and that investors would have "no opportunity to select or evaluate any . . . investments or strategies."

62.     The PPMs recognized that RAHFCO Management had a fiduciary duty to the RAHFCO Hedge Funds.

63.     Additionally the PPMs represented that Hansen was the founder, principal member, and president of RAHFCO Management, and a principal of Hudson Trading Partners, the designated sub-adviser.  The PPMs further represented that Hansen "control[ed] all of the Partnership's operations and activities."  The PPMs went on to say that Hansen had "the primary responsibility for researching, selecting and monitoring the Partnership's investments and making decisions on when and how much to invest in or withdraw from a particular investment."

64.     The PPMs for both RAHFCO Hedge Funds represented that RAHFCO Management intended to invest investor funds in fixed income securities.  The PPMs asserted that "[a] substantial percentage (as high as 90% in some cases) of the [Fund]'s portfolio is expected to be compromised of treasuries . . . ."

16

65.     According to the RAHFCO Hedge Funds PPMs, Puma was the manager and controlling member of the sub-adviser (HCP).  The sub-adviser served as the funds' primary portfolio management company -- executing trades, advising the General Partner, and recommending investments to the funds.

66.     The Growth LP PPM disclosed that defendant Puma had been sanctioned in 2003 by FINRA for an unauthorized trade resulting in a loss of $858.  The PPM did not disclose that Johnson was involved in the RAHFCO Hedge Funds or that he had been indicted for securities fraud in November, 2007 or that a finder hired by the RAHFCO Hedge Funds had been convicted in September, 2007 for selling unregistered securities.  Nor did the PPM disclose that Onsa, the trader for RAHFCO Hedge Funds, had been sued between 2004 and 2007 by various investors for securities fraud.

67.     No defendant ever disclosed to investors that Onsa was criminally indicted in November 2010 for securities fraud, that millions of dollars in judgments had been entered against Onsa in securities fraud actions.

68.     No defendant ever disclosed to investors that Growth LP, RAHFCO Management, Hansen, Puma, and Onsa had been sued, and settled the lawsuit, for failure to follow the touted trading strategy.

### Oral and E-mail Misrepresentations

69.     In order to attract new investments in the RAHFCO Hedge Funds and retain existing RAHFCO Hedge Fund investors Hansen and RAHFCO Management emailed prospective investors and brokers, spoke with them on the telephone, and traveled around the country to meet with them one-on-one and in group settings.  In the course of those communications, Hansen made numerous false and misleading representations.

17

70.     Hansen and RAHFCO Management e-mailed false representations regarding the success of RAHFCO Hedge Funds' trading strategy to investors.  Every month, based on information provided by Puma and HCP, Hansen and RAHFCO Management posted the percentage of earnings for that month on RAHFCO Hedge Funds' website.  Hansen frequently e-mailed the fictitious historical returns to various investors, brokers, and potential investors. These e-mails include:

a.      An April 10, 2007 e-mail to a prospective investor, in which Hansen says that the trading strategy is "over twenty years old and during that time has had only one year it produced less that 20%."

b.      A January 22, 2008 e-mail in which Hansen says, "We have a number of investors that have everything they own with us.  I would like them to diversify a little but they say they can not make the returns that we provide with the risk we have."  After receiving this e-mail, the investor invested $400,000.

c.      A March 20, 2008 e-mail, which included all of the fictitious historical returns to that time.  The recipient of the e-mail invested in April, 2008.

d.      An October 22, 2008 e-mail, in which Hansen claimed the result for October was a loss of 4 hundreds of one percent.  Hansen continued, "Not to [sic] bad considering average losses are running at least 30% for most other investments."  The e-mail was to a broker who had e-mailed Hansen that, "I want to show Rahfco [sic] to some clients and include the performance of Sept since it's been a ruff [sic] month for their Mutual funds."

71.     In addition, based on information provided by Puma and HCP, Hansen and RAHFCO Management caused the preparation of quarterly account statements reporting falsely inflated returns on the investors' funds.  These statements were mailed or e-mailed to every

1f

RAHFCO Hedge Fund investor. Puma and HCP knew and intended that the information they provided to Hansen and RAHFCO Management would be communicated to investors.

72.    Hansen and RAHFCO Management also caused the RAHFCO Hedge Funds' accounting firm to prepare Schedules K-1 which were mailed or e-mailed to every RAHFCO Hedge Funds investor. The Schedules K-1 reported falsely inflated returns on the investors' funds. The information in the Schedules K-1 was based on information provided by Puma and HCP to Hansen, RAHFCO Management, and the RAHFCO Hedge Fund's accounting firm. Puma and HCP knew and intended that the information he provided to Hansen and RAHFCO Management would be communicated to investors.

73.    During the scheme, Hansen also orally made false representations regarding the success of the RAHFCO Hedge Funds' trading strategy to investors in person and in telephone conversations. During these conversations, Hansen solicited investments, solicited additional investments from existing investors, or lulled investors who were considering redeeming their investments.

74.    In addition, Hansen e-mailed false representations to investors claiming that the RAHFCO Hedge Funds' trading strategy was safe, conservative, and low risk. Hansen also e-mailed false representations to investors claiming that the funds were liquid, and that funds could be redeemed upon thirty days' notice. These e-mails include:

a.    An April 10, 2007 e-mail, in which Hansen told a prospective investor, "We are not allowed by our document to risk over 5% a month on our trade. The balance is held in government bonds and cash. If I am not mistaken when you invest with other money managers or mutual funds your entire investment is at risk. If the market were to fall 80% you could lose 80% of your investment, In Capstone (which is now RAHFCO) your loss, if we were

wrong and not hedged which we always are, on such an event would be *5%* maximum."
Moreover, Hansen went on to falsely claim that, "It is a fact, however, that one of the wealthiest
families in the US has entrusted our trader with almost 200 million dollars to invest in this trade.
You can be sure they did their homework before investing . . . ."

       b.     An April 28, 2007 e-mail, in which Hansen reassured a nervous investor
by claiming, "Your money is very liquid as we are cash once every month." Hansen went on to
say that, "This is a fairly conservative trade as we risk only 5% of your capitol [sic] each month
so downside is limited."

       c.     A January 22, 2008 e-mail, in which Hansen tells an investor that only 5%
of the invested funds will ever be at risk, that the remaining 95% of the investment would be
held in "Gov[ernment] Bonds" or cash, and that the RAHFCO Hedge Funds were "completely
cash once every month so redeeming anything is not a problem." After receiving this e-mail, the
investor invested $400,000.

       d.     A February, 2008 e-mail, in which Hansen claims that there would never
be more than 5% of the invested funds at risk. After receiving this e-mail, the investor invested
$259,000.

       e.     A March 20, 2008 e-mail in which Hansen claims that the RAHFCO
Hedge Funds are "a lower risk investment," that the investment is "conservative," and that the
funds were "all cash once a month so the longest you will ever have to wait for funds is 30
days." After receiving this e-mail, the investor invested $100,000.

       f.     A series of July, 2008 e-mails, in which Hansen reassures a nervous
investor, claiming that most of the invested funds were invested in treasuries, which "hold only

the risk of failure by the US government." After receiving this e-mail, the investor made several additional investments.

g.      A May 25, 2010 e-mail, in which Hansen tells an investor, "we have been able to minimize that risk and make our first priority preservation of capital."

75.     During the scheme, Hansen also orally made false representations to investors in person and in telephone conversations, claiming that the RAHFCO Hedge Funds' trading strategy was safe, conservative, and low risk, that the funds were liquid, and that funds could be redeemed upon thirty days' notice. During these conversations, Hansen solicited investments, solicited additional investments from existing investors, or lulled investors who were considering redeeming their investments.

76.     Hansen also e-mailed false representations to investors claiming that audits by accountants were being performed on the RAHFCO Hedge Funds and their advisers. These e-mails include:

a.      A January 22, 2008 e-mail, in which Hansen claims that "We are audited twice." He claimed that Onsa and HCP were both audited by Price Waterhouse, and the RAHFCO Hedge Funds were "again" audited by Spicer Jeffries. None of these audits ever occurred.

b.      A February, 2008 e-mail, in which Hansen falsely claimed that the RAHFCO Hedge Funds were audited every year.

c.      A March 20, 2008 e-mail in which Hansen falsely claimed both that "our advisory is audited by Price Waterhouse" and that the RAHFCO Hedge Funds were also audited by another accounting firm. After receiving this e-mail, the investor invested $100,000.

21

77.     During the scheme, Hansen also orally made false representations to investors in person and in telephone conversations, claiming that audits were being performed on the RAHFCO Hedge Funds and their advisers.  During these conversations, Hansen solicited investments, solicited additional investments from existing investors, or lulled investors who were considering redeeming their investments.

78.     Hansen also e-mailed false representations to investors claiming that the RAHFCO Hedge funds were regulated and insured.  These e-mails include:

a.      A January 22, 2008 e-mail, in which Hansen falsely claimed, "We are very regulated.  We must meet all SEC restrictions and I report to them often."

b.      A February, 2008 e-mail in which Hansen falsely claimed that "we report regularly to the SEC . . . ."

c.      A July 14, 2008 e-mail in which Hansen reassures a nervous investor by falsely claiming that, "Your securities that are invested are protected by SPIC [sic].  This is a fund that is similar to the FDIC but insures securities.  It does not insure that you will never lose money on an investment but it does insure against failure by your broker or corruption by a broker or agent.  Their limit is [$]500,000 not [$]100,000 as the FDIC.  It has been tradition for both funds to cover all losses."

79.     During the scheme, Hansen also orally made false representations to investors in person and in telephone conversations, claiming that the RAHFCO Hedge funds were regulated and insured.  During these conversations, Hansen solicited investments, solicited additional investments from existing investors, or lulled investors who were considering redeeming their investments.

### Misrepresentations on RAHFCO's Website

80.      False statements regarding the success of the RAHFCO Hedge Funds' trading strategy appeared on RAHFCO's website. Puma and HCP, directly or through Johnson, called or emailed Hansen with the fictitious earnings of the RAHFCO Hedge Funds on a regular basis. Every month Hansen and RAHFCO Management posted the percentage of earnings for that month on RAHFCO's website. The website was available to all investors and maintained a record of the purported monthly earnings from inception through the end of the scheme. Hansen also permitted potential investors to view the website and review the returns.

81.      In addition to the posted fictitious earnings, Hansen included a monthly written "update" on the website that described the success of the funds. The updates included the following:

a.      In January 2008, Hansen assured investors of profitability, saying "[P]rofitable again this month in the midst of what can only be described as a collapsing market."

b.      In July 2008, Hansen stated that in one of the "most volatile times in history of our markets," even though "we have only returned about 3% for this quarter we are far above the norm in that return."

c.      In January 2009, Hansen represented that the funds had outperformed other indexes, claiming that even though the funds had only about "9% return for 2008," they outperformed the S&P and Nasdaq by 48% and the Dow by 43%.

d.      In October 2009, Hansen claimed that "[t]he difference between other funds and yours was, and is our ability to make returns even as the extraordinary events [aftermath of economic crisis] expose themselves."

e.     In December 2009, Hansen claimed that, "on a two year basis we have outperformed the market by 40%, and did it without causing the nausea that most of you have seen in your other accounts."

f.     In June 2010, Hansen promised that, "the potential for this fund to outpace anything else you may be doing with your investments, is greater now than at any point in time in our past and quite possibly our future."

g.     In March 2011, Hansen claimed that "For the month of February 2011 you[r] fund had a loss of .2% marking the first time in months we have reported a loss."

82.     False assurances regarding the safety and low risk of the RAHFCO Hedge Funds' trading strategy also appeared on RAHFCO's website. Monthly updates, written by Hansen, included the following:

a.     In May 2007, Hansen asserted that "we only commit 5% per month to our core strategy. This means that given a wipeout in the markets . . . we would still only have a 5% risk."

b.     In June 2008, Hansen confirmed that the "inherent risk in our trade is approximately 5% on any given month."

c.     In October 2008, Hansen reassured investors claiming that the funds had "LITTLE TO NO DOWNSIDE RISK for the month of October."

d.     In January 2009, Hansen again reassured investors, claiming to be planning a "major overhaul" to enhance transparency "in the wake of ridiculous amount of scandal."

e. In October 2009, Hansen claimed that the RAHFCO Hedge Funds were "more cautious than normal." . . . ."We intend to continue trading the way we always have, placing the protection of our clients [sic] initial investments above all else."

f. In December 2009, Hansen touted the purported relative safety of the funds, saying, "on a two year basis we have outperformed the market by 40%, and did it without causing the nausea that most of you have seen in your other accounts."

g. In June 2010, touted the purported liquidity of the funds, saying, "we are well aware that many of you look at our fund as a very liquid very steady investment . . . ."

83. False statements that the RAHFCO Hedge Funds' were audited also appeared on RAHFCO's website.

**By Ignoring Red Flags Hansen and RAHFCO Management Recklessly Committed Fraud**

84. Hansen was the founder, principal member, and president of RAHFCO Management. The only other employee of RAHFCO Management was Hansen's daughter, who provided clerical support to Hansen.

85. Hansen was the only principal with access to the bank accounts of the RAHFCO Hedge Funds. The RAHFCO Hedge Funds' bank statements were sent to RAHFCO Management's address. In addition, Hansen received copies of the RAHFCO Hedge Funds' brokerage statements. The RAHFCO Hedge Funds' brokerage statements were also sent to RAHFCO Management's address.

86. Hansen and RAHFCO Management knew, should have known, or recklessly disregarded that the initial $13 million supposedly rolled over from Capstone to Funds LP's was fictitious.

87.     In fact, at the time Funds LP was created, only approximately $130,000 was transferred from Capstone's bank account to Funds LP's bank account. Hansen and RAHFCO Management knew the amount of this transfer because Hansen controlled the RAHFCO Hedge Funds' bank accounts and received monthly bank statements. Additionally, Hansen and RAHFCO Management knew that the RAHFCO Hedge Funds brokerage accounts were not the repository of the $13 million because they received the funds' brokerage statements as well.

88.     Hansen and RAHFCO Management knew, should have known, or recklessly disregarded that RAHFCO Management was collecting excessive, undeserved management fees based on fraudulently inflated assets under management.

89.     Hansen and RAHFCO Management knew, should have known, or recklessly disregarded that the touted trading strategy was not followed.

90.     Hansen received copies of the brokerage statements for the Funds LP and Growth LP accounts. The account statements showed that Funds LP had net earnings from trading of only approximately $130,000 and Growth LP had net earnings of only approximately $150,000. Hansen and RAHFCO Management knew, should have known, or recklessly disregarded that these earnings were clearly insufficient to account for the $9 million of claimed earnings that was misrepresented to investors.

91.     The brokerage records Hanson received also revealed that all trading ceased for Funds LP after December 2008, and for Growth LP after December 2009. Hansen and RAHFCO Management, however, continued to solicit investor money in 2010 and 2011 using the touted trading strategy. Hansen and RAHFCO Management also continued to report false earnings despite the cessation of trading.

92.   Hansen and RAHFCO Management also knew that they and others had been sued for failure to follow the touted trading strategy.

93.   In May 2009, an investor sued Growth, RAHFCO Management, Hansen, Puma, and Onsa alleging fraud and breach of fiduciary duty, among other claims. According to the complaint, in July 2008, the investor invested $5 million based on representations from Hansen representing that the trading strategy had "superior returns based on proven trading strategies, stability of principal, low trading volume, efficiency, integrity, experience, and competence." On August 26, 2008, the investors had complained to the defendants in the suit that they were not using the "trading strategies as promised." In less than three months, the investor alleged that it had suffered a loss of nearly $1.3 million. Hansen settled the lawsuit and agreed to repay a portion of the loss. Despite the lawsuit, Hansen failed to take any steps to verify the claims of trading success or the existence of RAHFCO Hedge Funds investor money.

94.   Hansen and RAHFCO Management knew, should have known, or recklessly disregarded that most of the invested funds were not invested in cash or cash equivalents in RAHFCO Hedge Funds accounts and were, therefore, at risk.

95.   Every year for 2007 through 2010, Hansen and RAHFCO Management received Forms 1099 from the funds' brokerage firm and HCP and Puma. None of the Forms 1099 indicated earnings or interest from investments in U.S. Treasuries. Furthermore, the bank and brokerage statements of the RAHFCO Hedge Funds that Hansen received showed that only a small portion of investor funds remained in cash. Additionally, the bank and brokerage statements of the RAHFCO Hedge Funds showed total funds in an amount far less than Hansen and RAHFCO Management represented the funds held.

96.     In addition, Hansen knew that the defendants made Ponzi payments to investors. That is, he knew that new investor money was being used to pay redemptions for earlier investors that were withdrawing money from the funds.

97.     By at least 2009, HCP and Puma delayed or failed in providing cash in response to Hansen's calls for funds to pay redemptions requested by investors, even though the entire fund was supposed to be in cash or cash equivalents at least once each month.

98.     The RAHFCO Hedge Funds bank account statements received by Hansen and RAHFCO Management also showed continual cash shortages and new investor money being used to pay redemptions to withdrawing investors.

99.     Hansen also sent and received e-mails to other participants in the scheme indicating that new investor money was being used to pay redemptions to withdrawing investors.

100.     Hansen and RAHFCO Management knew that the RAHFCO Hedge Funds had not been and were not being audited by accountants.

101.     In April 2008, when the audit firm identified in the Funds LP PPM sought access to Funds LP's brokerage accounts to confirm the dollar amount in the accounts, Hansen and Puma refused access, stating that the accounts contained proprietary information. Instead, the audit firm received a letter from HCP stating that Funds LP's total investment with HCP was $19,348,000. The audit partner explained to Hansen and Puma that the letter was not sufficient audit evidence and that because Hansen and Puma would not provide access to the brokerage statements, it would have to resign from the engagement to perform the audit for fiscal year 2007.

102.     Additionally, there was never an audit conducted by any other firm of either of the RAHFCO Hedge Funds.

103.    Hansen and RAHFCO Management knew that the RAHFCO Hedge Funds did not engage or pay any other audit firm to conduct an audit of either fund.

104.    Hansen and RAHFCO Management knew, should have known, or recklessly disregarded that the RAHFCO Hedge Funds were not regulated by the Commission and were not insured or protected by SIPC or any other entity.

105.    Hansen and RAHFCO Management knew, should have known, or recklessly disregarded that Johnson -- who Hansen announced to investors in an August 2007 update as his partner in RAHFCO Management and who was actively involved in the RAHFCO Hedge Funds from inception until their collapse in May 2011 -- was permanently barred by the NASD in October 2006, indicted for securities fraud in November 2007, and pled guilty to conspiracy to commit securities fraud in November 2008.

106.    Hansen and RAHFCO Management knew, should have known, or recklessly disregarded that Onsa -- the trader for RAHFCO Hedge Funds -- was criminally indicted in November 2010 for securities fraud. Hansen and RAHFCO Management also knew, should have known, or recklessly disregard that Onsa was sued by various investors from 2004 through 2007 for securities fraud and defaulted, settled, and/or entered into a consent judgment in the various investor lawsuits.

107.    Hansen and RAHFCO Management also knew, should have known, or recklessly disregarded that one of the finders for the RAHFCO Hedge Funds -- who Hansen introduced to investors on the funds' website in April 2008 as a "knowledgeable" and "experienced" individual --, had been barred in January 2006 by the NASD and convicted in September 2007 of selling unregistered securities as an unregistered broker unrelated to the RAHFCO Hedge Funds (class B felonies).

## Puma and HCP Intentionally or Recklessly Committed Fraud

108.    HCP, through Puma, the manager and controlling member of the sub-adviser, served as the funds' primary portfolio management company -- executing trades, advising the General Partner, and recommending investments to the funds. Puma controlled the purported trading in the RAHFCO Hedge Funds brokerage accounts and received copies of the brokerage statements.

109.    Puma and HCP knew that the $13 million he allegedly held and rolled over to Funds LP was fictitious.

110.    Puma and HCP knew that the touted trading strategy was not followed.

111.    Puma and HCP knew that the purported returns – that were provided to Hansen and RAHFCO Management on a monthly basis and disseminated to investors – were fictitious.

112.    Puma and HCP also received copies of the brokerage statements for the Funds LP and Growth LP brokerage accounts. The account statements showed Puma that Funds LP had net earnings from trading of only approximately $130,000 and Growth LP had net earnings of only approximately $150,000. These account statements did not support the earnings amounts provided by Puma and HCP for investor account statements. Puma and HCP also knew that all trading ceased for Funds LP after December 2008, and for Growth LP after December 2009.

113.    Puma and HCP knew that they continually represented that the funds held more assets than ever existed in the RAHFCO Hedge Funds' bank and brokerage accounts.

114.    Puma and HCP knew that most of the invested funds were not invested in cash or cash equivalents in accounts belonging to or in the name of the RAHFCO Hedge Funds and were, therefore, at risk. Every year from 2007 through 2010, Puma and HCP disseminated

Forms 1099 for the RAHFCO Hedge Funds. None of them indicated earnings or interest from investments in U.S. Treasuries.

115. Puma and HCP knew that by, at least 2009, Puma and HCP delayed or failed in providing cash in response to Hansen's calls for funds to pay redemptions requested by investors, even though the entire fund was supposed to be in cash or cash equivalents at least once each month.

### Hansen and RAHFCO Management Were Investment Advisers

116. The RAHFCO Hedge Funds were pooled investment vehicles.

117. Hansen and RAHFCO Management advised the RAHFCO Hedge Funds as to the advisability of investing in securities.

118. Hansen and RAHFCO Management received compensation, in the form of management fees, based on the net asset value of each fund, for their advisory services.

### Hansen and RAHFCO Management Were Unregistered Broker-Dealers

119. Defendants Hansen and RAHFCO Management were regularly engaged in the business of selling the securities of the RAHFCO Hedge Funds to investors for their accounts in the RAHFCO Hedge Funds.

120. Defendants Hansen and RAHFCO Management offered and sold the securities of the RAHFCO Hedge Funds using the mails, the telephone, and the internet.

121. Hansen and RAHFCO Management received compensation for each transaction in which investors bought the securities of the RAHFCO Hedge Funds.

122. Defendants Hansen and RAHFCO Management were not registered as broker-dealers.

**Investors Lost Over $10 Million, While Defendants Made Millions**

123.    Pursuant to the scheme, Hansen, RAHFCO Management, Puma, and HCP raised approximately $23.5 million from 2007 to 2011 from approximately 100 investors nationwide to invest in the RAHFCO Hedge Funds.

124.    The touted trading strategy was not successful, however, and resulted in only $280,000 in trading profits.

125.    In large part, the money raised was used to pay investor withdrawals.

126.    About 40 of the approximately 100 investors remained in the RAHFCO Hedge Funds at the time of the collapse in May 2011. These investors lost approximately $10.2 million. They had deposited approximately $12.9 million into the funds and withdrawn only about $2.7 million.

127.    The other approximately 60 investors had liquidated their accounts before the collapse. These investors had deposited about $10.6 million in the funds and, based on their false earnings, withdrew about $16.7 million – approximately $6.1 million more than they had deposited.

128.    Because the RAHFCO Hedge Funds only made approximately $280,000 in gross trading profits, new investor funds were the primary source of funds to meet the withdrawal requests.

129.    Accordingly, Hansen and Puma paid at least $5.6 million in Ponzi payments to the liquidating investors.

130.    Hansen, his family, and his businesses withdrew approximately $760,000 more than they deposited into the RAHFCO Hedge Funds.

131.    RAHFCO Management also received $1.19 million in fees from investors.

132.    The funds also paid Puma and HCP $1.65 million.

## FIRST CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]
### Fraud in the Offer or Sale of Securities
### By Defendants Hansen, RAHFCO Management, Puma, and HCP

133.    As alleged in paragraphs 1 through 30, 42 through 115, and 123 through 132, defendants Hansen, RAHFCO Management, Puma, and HCP directly and indirectly obtained money or property by means of material false and misleading statements in the offer and sale of the securities of the RAHFCO Hedge Funds.

134.    As alleged in paragraphs 1 through 115 and 123 through 132, defendants Hansen, RAHFCO Management, Puma, and HCP engaged in a scheme to defraud investors in the offer and sale of the securities of the RAHFCO Hedge Funds.

135.    By virtue of the conduct alleged in this complaint defendants Hansen, RAHFCO Management, Puma, and HCP, in the offer or sale of securities, by the use of the means or instruments of transportation and communication in interstate commerce, or of the mails, directly or indirectly:  (a) employed devices, schemes or artifices to defraud with scienter; (b) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

136.    By virtue of the foregoing, defendants Hansen, RAHFCO Management, Puma, and HCP, directly or indirectly, violated, and unless enjoined, will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

137.    In the alternative, by virtue of the foregoing, defendant HCP aided and abetted, and unless enjoined, will again aid and abet, Puma's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]**
**and Rule 10b-5 [17 C.F.R. § 240.10b-5] Thereunder**
**Fraud in the Purchase or Sale of Securities**
**By Defendants Hansen, RAHFCO Management, Puma, and HCP**

138.    As alleged in paragraphs 1 through 30, 42 through 115, and 123 through 132, defendants Hansen, RAHFCO Management, Puma, and HCP directly and indirectly made material false and misleading statements in connection with the purchase and sale of the securities of the RAHFCO Hedge Funds.

139.    As alleged in paragraphs 1 through 115 and 123 through 132, defendants Hansen, RAHFCO Management, Puma, and HCP engaged in a scheme to defraud investors in connection with the purchase and sale of the securities of the RAHFCO Hedge Funds.

140.    By virtue of the conduct alleged in this complaint, defendants Hansen, RAHFCO Management, Puma, and HCP, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly, with scienter:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

141.    By virtue of the foregoing, defendants Hansen, RAHFCO Management, Puma, and HCP, directly or indirectly, violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
**Violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]**
**Offer and Sale of Securities by an Unregistered Broker-Dealer**
**By Defendants Hansen and RAHFCO Management**

142.    As alleged in paragraphs 1 through 14 and 119 through 122, from 2007 through 2011, defendants Hansen and RAHFCO Management offered and sold securities even though they were not registered with the Commission as broker-dealers or associated with broker-dealers registered with the Commission and received compensation for doing so.

143.    By virtue of the conduct alleged in this complaint, defendants Hansen and RAHFCO Management, while not registered as or associated with a broker or dealer made use of the means or instruments of interstate commerce to induce or attempt to induce the purchase or sale of a security.

144.    By virtue of the foregoing, defendants Hansen and RAHFCO Management, directly or indirectly, violated, and unless enjoined, will again violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

### FOURTH CLAIM FOR RELIEF
**Violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)]**
**Fraud by an Investment Adviser**
**By Defendants Hansen and RAHFCO Management**

145.    As alleged in paragraphs 1 through 14, 22 through 41, 60 through 65, 84 through 107, 116 through 118, and 123 through 132, defendants Hansen and RAHFCO Management were investment advisers who defrauded their clients by charging management fees based on fraudulently inflated assets.

146.    By virtue of the conduct alleged in this complaint, defendants Hansen and

RAHFCO Management, by use of the mails or means or instrumentality of interstate commerce,

while acting as investment advisers, directly or indirectly:  (1) employed devices, schemes, and

artifices to defraud their clients with scienter; and (2) engaged in transactions, practices, or

courses of business which operated as a fraud and deceit upon their clients.

147.    By virtue of the foregoing, defendants Hansen and RAHFCO Management,

directly or indirectly, violated, and unless enjoined, will again violate, Sections 206(1) and

206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

**FIFTH CLAIM FOR RELIEF**
**Violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)]**
**and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]**
**Fraud by an Investment Adviser**
**By Defendants Hansen and RAHFCO Management**

148.    As alleged in paragraphs 1 through 107, 116 through 118, and 123 through 132,

defendants Hansen and RAHFCO Management were investment advisers to pooled investment

vehicles who defrauded clients of the investment vehicles.

149.    By virtue of the conduct alleged in this complaint, defendants Hansen and

RAHFCO Management, by use of the mails or means or instrumentality of interstate commerce,

directly or indirectly, while acting as investment advisers to pooled investments, with respect to

investors and prospective investors in the pooled investments:  (1) made untrue statements of

material fact and/or omitted to state material facts necessary in order to make the statements

made, in the light of the circumstances under which they were made, not misleading; and

(2) engaged in acts, practices, or courses of business that were fraudulent, deceptive, and/or

manipulative.

150.    By virtue of the foregoing, defendants Hansen and RAHFCO Management, directly or indirectly, violated, and unless enjoined, will again violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

### SIXTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act
[15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)]
and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]
Aiding and Abetting Fraud by an Investment Adviser
By Defendants Puma and HCP**

151.    As alleged in paragraphs 1 through 107, 116 through 118, and 123 through 132, defendants Hansen and RAHFCO Management violated Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

152.    As alleged in paragraphs 1 through 83, 108 through 115, and 123 through 132, defendants Puma and HCP knowingly or recklessly provided substantial assistance to Hansen and RAHFCO Management's violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

153.    By virtue of the foregoing, defendants Puma and HCP, directly or indirectly, violated, and unless enjoined, will again violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

### RELIEF SOUGHT

**WHEREFORE,** the Commission respectfully requests that this Court enter a Final Judgment:

I.

Permanently restraining and enjoining defendants Hansen and RAHFCO Management from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78o(a)], Rule 10b-5 thereunder [17 C.F.R.

§ 240.10b-5], Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

## II.

Permanently restraining and enjoining defendants Puma and HCP from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) 206(2) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2) and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

## III.

Ordering defendants Hansen, RAHFCO Management, Puma, and HCP to disgorge, with prejudgment interest, all ill-gotten gains received as a result of the conduct alleged in this Complaint;

## IV.

Ordering defendants Hansen, RAHFCO Management, Puma, and HCP to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)];

## V.

Granting such other and further relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

The Commission demands a jury trial in this matter.

Dated: February 28, 2013

Polly Atkinson
Kimberly L. Frederick
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
Denver Regional Office
1801 California Street, Suite 1500
Denver, CO 80202-2656
(303) 844-1000